UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREG TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-01496-JMS-CSW |
| | ) | |
| WILLIAM JONES, | ) | |
| VICKIE BURDINE Doctor, | ) | |
| WILLIAM MAYS Doctor, | ) | |
| CHRISTINE LIEDTKE Doctor, | ) | |
| MICHELLE COMMANDER MHP, | ) | |
| CENTURION HEALTH OF INDIANA, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BUZAN, | ) | |
| RAZOR, | ) | |
| MCKINNEY, | ) | |
| MARADOS, | ) | |
| MARTIN et al., | ) | |
| | ) | |
| Consol. Defendants. | ) | |

**ORDER**

Plaintiff Greg Taylor[1] brought this civil action alleging Eighth Amendment deliberate indifference, First Amendment retaliation, and state negligence claims against defendants. The defendants include Indiana Department of Correction ("IDOC") correctional officers, Officers

---

[1] The Court takes judicial notice of *Star Gregory A. Taylor v. Reagle, et al.,* 2:24-cv-00115-JPH-MG (S.D. Ind., April 9, 2024), a separate matter also filed by Ms. Taylor, in which she is proceeding *pro se*. In it, Ms. Taylor states that she is a transgender prisoner and refers to herself with feminine pronouns. Accordingly, the Court will adopt feminine pronouns for Ms. Taylor going forward in this matter. *Dyjak v. Wilkerson,* Nos. 21-2012 and 21-2119, 2022 WL 1285221, at *1 (7th Cir. Apr. 29, 2022) (explaining federal courts' "normal practice of using pronouns adopted by the person before [them]").  However, Ms. Taylor's name will remain the same in the caption as no amendment has been sought.

Buzan, Razor, McKinney, Morados[2], and Martin ("IDOC Defendants"), Centurion Health of Indiana, LLC ("Centurion"), a health care provider contracted to provide health services to IDOC inmates, Dr. William Jones, a *locum tenens* physician, and Centurion-employed health care professionals, Dr. Vickie Burdine, Dr. William Mays, and Mental Health Professional ("MHP") Michelle Commanders ("Medical Defendants").

Pending before the Court are three motions for summary judgment, filed by Ms. Taylor, the IDOC Defendants, and Centurion and the Medical Defendants. For the reasons below, Ms. Taylor's motion, dkt. [159], is **denied**, and the defendants' motions, dkts. [163] and [181], are **granted**.

## I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

---

[2] The **clerk is directed** to correct the spelling of Defendant Marados' name to "Morados." *See* dkt. 165.

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. Procedural History

Ms. Taylor filed this matter on July 27, 2022. Dkt. 1. The Court screened her initial complaint and allowed Eighth Amendment deliberate indifference claims to proceed against Centurion, Dr. Jones, Dr. Burdine, Dr. Liedtke, and MHP Commander; First Amendment retaliation claims to proceed against Dr. Mays; state law medical malpractice claims to proceed against Dr. Jones and Dr. Burdine; and state law negligence claims to proceed against Dr. Liedtke, MHP Commander, Dr. Jones, and Dr. Burdine. Dkt. 7.

On January 4, 2023, Centurion and the Medical Defendants moved to consolidate this matter with another, *Greg Taylor v. Christine Liedtke, et al.,* No. 1:22-cv-1746-JMS-KMB, arguing

3

that "both matters involve Plaintiff's claims of deliberate indifference to what [s]he alleges is a continuing mental health condition that creates a substantial risk of self-harm." Dkt. 62 at 3. Case -1746 was proceeding against Defendants McKinney, Morados, Buzan, Razor, Martin, and Dr. Liedtke on Eighth Amendment deliberate indifference claims. No. 1:22-cv-1746-JMS-KMB, dkt. 9. On June 2, 2023, the two cases were consolidated and Ms. Taylor's motion for assistance recruiting counsel was granted. Dkts. 104, 105. Counsel was appointed on September 12, 2023, and an amended complaint was filed on October 31, 2023. Dkts. 121, 129. The amended complaint alleged state law negligence, First Amendment retaliation, and Eighth Amendment deliberate indifference claims *related to Ms. Taylor's time on constant suicide watch*, beginning on November 21, 2021. Dkt. 129 at 2-6 (emphasis added). The Court screened the amended complaint, allowing "the state law negligence claims and the First and Eighth Amendment claims [to] proceed as submitted." Dkt. 133 at 3.

Additionally, after multiple failed attempts to serve Dr. Jones, who is not employed by either the IDOC or Centurion, the Court directed the United States Marshals Service to serve him on August 23, 2023. Dkt. 114. The Marshals successfully did so on September 14, 2023. Dkt. 122. However, Dr. Jones never appeared in this matter. Ms. Taylor moved for default judgment against him on August 9, 2024. Dkt. 168. The Court granted her motion to the extent that, pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, it directed the clerk to enter a default against Dr. Jones. Dkt. 198.

### III. Claims Not Proceeding in this Action

The Supreme Court recently confirmed what has long been established:

> If a plaintiff amends her complaint, the new pleading "supersedes" the old one: The "original pleading no longer performs any function in the case." 6 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1476, pp. 636-637 (3d ed. 2010). Or as we put the matter over a century ago: "When a petition is amended," the "cause proceeds on the

amended petition." *Washer v. Bullitt County,* 110 U.S. 558, 562 (1884). So changes in parties, or changes in claims, effectively remake the suit.

*Royal Canin U.S.A., Inc., v. Wullschleger,* 604 U.S. 22, 35 (2025). This is also true of factual changes to amended pleadings. *Pirant v. U.S. Postal Service,* 542 F.3d 202, 207 (7th Cir. 2008) (in rejecting argument that factual change in amended answer entitled the plaintiff to a trial, the Court stated "[a]n amended pleading supersedes the original and an inconsistency between the initial and amended pleading does not preclude summary judgment") (citation omitted).

Here, the Court ordered Ms. Taylor to amend her complaint after two of her cases were consolidated "to eliminate the confusion of having two operative complaints." Dkt. 105 at 3. She was specifically directed to incorporate the claims pending in both consolidated cases in her amended complaint and also permitted to include "the claims that were identified but severed" in the second case. *Id.*

Despite the Court's clear orders, Ms. Taylor's amended complaint only includes factual allegations related to her time on constant suicide watch, which the record makes clear occurred in the HRU, or Hospital Restoration Unit. Dkts. 129 at 2-3; 164-1 at 35-36; 164-2 at 3. At screening, her amended complaint was permitted to proceed "as submitted" on state law negligence and First and Eighth Amendment claims. Dkt. 133 at 3. Accordingly, any claims she previously pleaded in either of her original complaints regarding her time in the Intensive Residential Treatment Unit ("IRT"), as opposed to the HRU, are no longer proceeding in this matter and are not properly before the Court.

This includes all of Ms. Taylor's First Amendment claims. She alleges various acts of retaliation but makes clear at her deposition that all of them relate to her time in the IRT. Dkt. 164-1 at 70-90. She makes no allegations or arguments that she engaged in protected First Amendment activity during her time in the HRU. Accordingly, she cannot demonstrate that she suffered a

deprivation based on such conduct, never mind that any defendant caused a deprivation in order to deter future protected activity. All defendants are therefore entitled to summary judgment on her retaliation claims.

### IV. Factual Background

#### A. Parties

At all relevant times, the following was true for all parties:

Plaintiff Greg Taylor was incarcerated at Pendleton Correctional Facility ("Pendleton"). Dkt. 160 at 1. Pendleton is an IDOC facility. Dkt. 1 at 2. Ms. Taylor has been diagnosed with Bipolar Disorder, PTSD, Borderline Personality Disorder, Antisocial Personality Disorder, and Schizoaffective Disorder. Dkt. 160 at 1.

Defendant McKinney was a lieutenant. Dkt. 164-2 at 1. Defendant Morados was a correctional sergeant and Defendants Buzan, Razor, and Martin were correctional officers. Dkt. 165 at 2. They were employed at Pendleton. *Id.*

Defendant Centurion provided healthcare services as a contracted vendor to IDOC inmates. Dkt. 132 at 2. Defendants Dr. Burdine and Dr. Mays are physicians. *Id.* at 1. Defendant Dr. Liedtke is a clinical psychologist. *Id.* Defendant MHP Commander is a mental health professional. *Id.* at 1-2.

#### B. The HRU

On November 21, 2021, Ms. Taylor attempted suicide by cutting her right, inner elbow. Dkts. 160 at 2, 182-1 at 4. She was transported to Ascension St. Vincent Hospital in Indianapolis, where she was intubated due to "altered mental status and agitation" and "found to have no arterial bleeding and only venous bleeding vessels, which were tied off and ligated." Dkt. 182-1 at 9. The next day, she was cleared by the psychiatry team at the hospital for discharge to suicide watch at

Pendleton. *Id.* Indeed, when Ms. Taylor was initially transported to the hospital, MHP Commander placed her on "Constant Observation in HRU when [s]he returns from the hospital." *Id.* at 5.

The HRU is a unit designated for inmates on active suicide watch. Dkt. 164-2 at 3. The HRU utilizes video feeds and the assistance of suicide companions to keep constant observation of inmates on suicide watch. Dkt. 164-1 at 36-37. Suicide companions are general population inmates whose job is to log what their assigned inmate is doing. *Id.* at 36-38. IDOC staff assigned to the HRU are expected to strip search suicide watch companions entering the Unit, monitor both the companions and inmates in the Unit, and monitor the video feeds of the inmates on suicide watch. Dkt. 164-2 at 3. The officers are also supposed to log what the inmates are doing. Dkt. 164-1 at 36. Ms. Taylor does not know who was assigned to monitor the video feeds while she was in the HRU. *Id.* at 40.

Ms. Taylor returned to Pendleton on November 22, 2021, and was placed in the HRU. *Id.*; dkt. 164-2 at 3. Despite the Unit's safety policies, she was repeatedly able to obtain razor blades from her companions; they gave them to her "for seven days straight [and] they let [her] cut up [her]self." Dkt. 164-1 at 51. The MHP Commander was also supposed to meet with Ms. Taylor daily for suicide monitoring sessions while she was in the HRU. *Id.* at 45. Ms. Taylor's medical records indicate she met with her on eight of the fifteen days she was in the HRU. Dkt. 182-1 at 16, 20, 35, 39, 42, 51, 55, 59, 63.

On her first day in the HRU, Ms. Taylor used a razor to reopen the wound she had from her suicide attempt the day before. Dkt. 182-1 at 15. Within hours, she again cut herself superficially. *Id.* The next day, she told the MHP Commander that she wanted to leave the HRU, the IRT (which is her normal housing unit), and Pendleton. *Id.* at 16; dkt. 164-2 at 1. She also stated she would "continue to cut [her]self until [s]he was transferred" and refused to give staff her

7

razors or disclose where they were hidden. Dkt. 182-1 at 16. The MHP Commander notified IDOC staff and requested Ms. Taylor's cell be searched. *Id.*

On November 24, Ms. Taylor initially refused to speak with the MHP Commander for their daily meeting, but then agreed to be seen by medical staff. *Id.* at 20. She had cut herself on her neck and arm, requiring stitches. *Id.* at 24-25. However, once in the medical unit, she again refused treatment and would not speak with the MHP Commander further. *Id.* at 20. Because she "strongly refused care," the psychology team ordered medication. *Id.* at 23. Haldol Lactate was originally going to be used, but it was disposed of per Dr. Burdine's orders because Ms. Taylor is allergic to it. *Id.* at 28. Instead, Benadryl was injected. *Id.* at 23, 28. Later in the day, Ms. Taylor agreed to medical care. *Id.* at 23-25. However, she again stated her intent to use hidden razors for further self-harm. *Id.* at 24. Repeated searches of her cell were fruitless in locating the blades and she had a history of swallowing them in the past, so x-rays were ordered. *Id.* at 24-25. Ms. Taylor refused the x-ray, threatening to sue staff if they touched her. *Id.* at 25.

On November 26, Dr. Liedtke, a clinical psychologist, met with Ms. Taylor per her request. *Id.* at 31-33. Dr. Liedtke noted that Ms. Taylor's "attitude was demanding, hosile [sic], accusatory" and that she expressed wanting to be left alone in her cell. *Id.* at 32. She also told Dr. Liedtke that she was suing her because she remained on suicide watch in the HRU. *Id.* Dr. Liedtke "expressed genuine concern for [her] safety" and noted that Ms. Taylor "seemed to calm some" and "seemed to respond favorabl[y] to concrete information." *Id.* Ms. Taylor agreed to manage her urges to self-harm over the weekend and reassess with Dr. Liedtke the following Monday. *Id.*

On Monday, November 29, Ms. Taylor again met with the MHP Commander. *Id.* at 35. The MHP Commander told Ms. Taylor that she needed to focus on demonstrating safe behavior and must remain free of suicidal ideation and self-harming behaviors for seven consecutive days in

8

order to be removed from the HRU. *Id.* Ms. Taylor was upset by the requirement and felt she "was being singled out." *Id.* She also reported difficulty sleeping and requested new medication. *Id.* She met with Dr. Jones for medication management the next day, but Dr. Jones refused Ms. Taylor's request to be placed on Wellbutrin because he felt she was doing well on her current medications. *Id.* at 46. The MHP Commander also met with Ms. Taylor again, and she again reported that she was unhappy at still being on suicide watch and she intended to sue because her "rights are being violated." *Id.* at 39, 42.

The MHP Commander met with Ms. Taylor on December 1, 2, 3, and 6. *Id.* at 51, 55, 59, 63. Each time, Ms. Taylor indicated she "was ok" and often inquired about new medication. *Id.* On December 6, she told the MHP Commander that she was ready to leave suicide watch because it had been seven days. *Id.* at 63. The MHP Commander then discharged her from suicide watch and ordered follow-up protocols, with monitoring at one day, one week, two weeks, and four weeks. *Id.*[3]

## V. Discussion

### A. Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v.*

---

[3] The IDOC Defendants argue that Ms. Taylor was in the HRU through December 1, 2021. Dkt. 164-2 at 3 ("I personally reviewed the shift rosters for the dates in which Plaintiff was in the HRU on constant observation suicide watch, November 22, 2021 through up to December 1, 2021."); *see* dkt. 165. However, the record reflects this contention is in error. Ms. Taylor's medical records clearly indicate that she was housed in Cell 7 of the HRU on December 3 and December 6, and that she was discharged from close observation suicide watch on December 6, 2021. Dkt. 182-1 at 55, 63 ("[Patient] was awake and on [her] mat on the floor of HRU #7" and "[Patient] was awake, lying on mat by cell front door (HRU #7)," respectively).

*Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). The defendants do not dispute that "suicide is an objectively serious medical condition," so the Court proceeds to the subjective component. *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020).

In cases involving suicide or attempted suicide, "the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk. This requires more than mere or gross negligence, but less than purposeful infliction of harm." *Lisle v. Welborn*, 933 F.3d 705, 716−17 (7th Cir. 2019) (cleaned up).

Further, "'[t]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.*

### 1. IDOC Defendants

Ms. Taylor argues that the IDOC Defendants were deliberately indifferent to her serious medical needs by allowing inmates to serve as suicide companions and not searching them prior to accessing the HRU, thereby allowing them to provide her access to razor blades to continue self-harming. Dkts. 129 at 5; 160 at 8.

However, Ms. Taylor testified that she does not know if any of the defendants in this matter were responsible for monitoring her cell camera while she was in the HRU, and the only monitoring that occurred in the Unit was via inmate companions, the cell camera, and MHP Commander's visits every 24 hours. Dkt. 164-1 at 40-41. Lieutenant McKinney provided shift rosters for the HRU from November 21 through December 1, 2021. Dkt. 164-3. He stated that none of the IDOC Defendants were assigned to work in the HRU while Ms. Taylor was under constant suicide watch, and the shift rosters support that assertion for November 21 through December 1. *Id.*; dkt. 164-2 at 2. He further stated that "as women, Defendants Morados, Razor, and Buzan could not be stationed in that unit." Dkt. 164-2 at 4. A Sergeant McKinney was assigned to the HRU at certain times while Ms. Taylor was there, but that was non-party Sergeant Floyd McKinney, not Defendant Lieutenant Kyle McKinney. *Id.*

The undisputed record reflects that there is no evidence to establish that the IDOC Defendants were assigned to the HRU or responsible for duties related to the HRU during the relevant time Ms. Taylor was housed there. Three of the named IDOC Defendants, Officers Morados, Razor, and Buzan, are women and therefore could not be assigned to the HRU at any point. Lieutenant McKinney attests that he did not work in the HRU and Ms. Taylor admits that she did not know who was assigned to the HRU while she was housed there. Dkts. 164-2 at 4, 164-1 at 40-41. Therefore, she lacks any evidence that any of the named IDOC Defendants were personally responsible for allowing her to gain access to razor blades, thus allowing her to self-harm, while she was on constant suicide watch. As such, the IDOC Defendants are entitled to summary judgment on this claim.

    2. *Medical Defendants*

"[M]edical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Petties*, 836 F.3d at 729;

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30; *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021).

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Petties*, 836 F.3d at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

Ms. Taylor alleges that the Medical Defendants were deliberately indifferent to her serious medical needs by refusing to provide her certain medications, discontinuing other medication, not ordering the use of restraints when they knew she was harming herself, allowing her to obtain razor blades to self-harm, and refusing to diagnose and treat her Attention Deficit Disorder ("ADD"). Dkt. 129 at 4-5.

### a. Dr. Mays

Nothing in the record indicates that Dr. Mays interacted with Ms. Taylor, much less treated her, while she was on suicide watch in the HRU. Dkt. 182-1 at 1-64. Therefore, he cannot be personally responsible for any alleged injury she sustained during that time. *Whitfield*, 76 F.4th at 706. Accordingly, he is entitled to summary judgment on this claim.

### b. Dr. Burdine

During the relevant time, Dr. Burdine was only involved in Ms. Taylor's medical care on November 24, after Ms. Taylor again engaged in self-harm. *Id.* at 25, 28. Nurse Hale called Dr. Burdine to provide an update on Ms. Taylor's condition and the treatment she was receiving. *Id.* at 25. Then, contrary to Ms. Taylor's assertions that she was given medication to which she is allergic, dkt. 160 at 4, Dr. Burdine ordered that medical staff *not* use Haldol Lactate because of her allergy and staff then threw away the Haldol and administered Benadryl instead. Dkt. 182-1 at 28.

There is nothing in the record that indicates Dr. Burdine acted subjectively indifferent, persisted in treatment she knew was ineffective, or departed substantially from accepted medical practice in treating Ms. Taylor. Accordingly, she is entitled to summary judgment on this claim.

### c. Dr. Liedtke

Ms. Taylor had only one session with Dr. Liedtke, a clinical psychologist, while she was in the HRU, per Ms. Taylor's request. *Id.* at 31-33. Dr. Liedtke noted that when she arrived at Ms. Taylor's cell, she was demanding, hostile, and accusatory, and stated that she wanted to be left alone in her cell. *Id.* at 32. She also informed Dr. Liedtke that she was suing her because she remained on close observation suicide watch in the HRU. *Id.* Dr. Liedtke responded by expressing genuine concern for her safety, which she observed seemed to calm Ms. Taylor somewhat. *Id.* After some discussion and sharing "concrete information," Ms. Taylor "agreed to use skills to manage urges over the weekend." *Id.* Dr. Liedtke noted that she "was quite impressed with [her] ability to take in information and demonstrate at least some insight." *Id.*

There is nothing in the record that indicates Dr. Liedtke acted subjectively indifferent, persisted in treatment she knew was ineffective, or departed substantially from accepted medical practice in treating Ms. Taylor. Indeed, in response to being told Ms. Taylor was suing her, she positively engaged with Ms. Taylor by expressing genuine concern for her safety and was able to

persuade her into agreeing not to self-harm for the weekend. *Id.* at 31-33. Therefore, Dr. Liedtke is entitled to summary judgment on this claim.

### d. MHP Commander

The MHP Commander placed Ms. Taylor on constant observation suicide watch in the HRU following her November 21 suicide attempt. *Id.* at 5. She met with her eight of the fifteen days she was in the HRU for suicide monitoring sessions. *Id.* 16, 20, 35, 39, 42, 51, 55, 59, 63. During their first session, Ms. Taylor threatened to continue to self-harm until she was transferred and the MHP Commander notified IDOC staff of her threat and requested that her cell be searched. *Id.* at 16. Ms. Taylor initially refused to speak with the MHP Commander during their second session, but then agreed to be seen by medical staff. *Id.* at 20. She had cut her neck and arm and required stitches. *Id.* at 24-25. Once in the medical unit, however, she again refused to speak with the MHP Commander. *Id.* at 20.

In the next session, the MHP Commander explained to Ms. Taylor that in order to be released from constant observation, she needed to focus on demonstrating safe behavior and remain free of suicidal ideation and self-harming behaviors for seven consecutive days. *Id.* at 35. Ms. Taylor continued to express her unhappiness at remaining in the HRU during her next two sessions with the MHP Commander and told her that she was going to sue because her "rights are being violated." *Id.* at 39, 42. However, Ms. Taylor stopped complaining about her placement in her remaining sessions, instead indicating she "was ok" and only inquiring about the status of her medication. *Id.* at 51, 55, 59. The MHP Commander discharged her from the HRU on December 6, and ordered follow-up protocols. *Id.* at 63.

No reasonable jury could conclude on the record before the Court that the MHP Commander subjectively knew that Ms. Taylor was at a substantial risk of committing or

14

attempting to commit suicide and intentionally disregarded that risk. *Lisle*, 933 F.3d at 716-17. During the first two sessions they had, the record supports that the MHP Commander subjectively knew that Ms. Taylor was at a substantial risk of committing or attempting to commit suicide. However, she responded reasonably in both instances. In the first, she notified IDOC staff that Ms. Taylor stated she had razor blades in her cell and requested that they conduct a search of her cell, and in the second, she persuaded Ms. Taylor to agree to medical treatment for her self-inflicted injuries despite her initial refusal to speak with the MHP Commander. Dkt. 182-1 at 16, 20.

In the remainder of their sessions, there is nothing in the record to reflect that the MHP Commander should have been subjectively aware of any danger to Ms. Taylor. In those sessions, Ms. Taylor indicated she "was ok" and focused her inquiries on her medication. *Id.* at 51, 55, 59. The MHP Commander provided Ms. Taylor updates on her medication status and relayed her questions to her physicians. *Id.* After Ms. Taylor went seven consecutive days without indicating suicidal ideation or engaging in such behaviors, per policy, the MHP Commander discharged her from constant observation suicide watch. *Id.* at 63.

Accordingly, the MHP Commander is entitled to summary judgment on this claim.

e. **Centurion**

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983. *Dean*, 18 F.4th at 235. Centurion cannot be held liable under the common-law theory of respondeat superior for its employees' actions. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

Thus, to prevail on a claim against Centurion, Ms. Taylor must show that the deprivation was caused by a Centurion custom or policy or failure to implement a needed policy. *Dean*, 18

F.4th at 235. Ms. Taylor does not argue such a custom or policy exists, nor did she respond to Centurion's arguments in her responsive brief. Dkt. 193. Further, no evidence in the record supports a conclusion that such a custom or policy caused the alleged Eighth Amendment violations Ms. Taylor is pursuing in this case. Therefore, Centurion is entitled to summary judgment.

### B. State Law Negligence

The Court must apply Indiana law by doing its "best to predict how the Indiana Supreme Court would decide" the issues. *Webber v. Butner*, 923 F.3d 479, 482 (7th Cir. 2019). In Indiana, "[a] plaintiff seeking damages for negligence must establish (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Pfenning v. Lineman,* 947 N.E.2d 392, 398 (Ind. 2011).

#### 1. IDOC Defendants

For the reasons explained in Part A(1) above, the IDOC Defendants cannot be found to be negligent because none of them were assigned to work in the HRU and thus none of them owed a duty to Ms. Taylor.

However, even if that were not true, the Indiana Tort Claims Act ("ITCA") bars Ms. Taylor's negligence claims against them. The ITCA "governs lawsuits against political subdivisions and their employees." *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003) (citing Ind. Code § 34-13-3-1 et seq.). "Under the Indiana Tort Claims Act, there is no remedy against the individual employee so long as he was acting within the scope of his employment." *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014). "Scope of employment" includes "conduct of the same general nature as that authorized, or incidental to the conduct authorized." *Celebration Fireworks, Inc. v. Smith,* 727 N.E.2d 450, 453 (Ind. 2000) (citations omitted). Further, to proceed on a state law negligence claim against an individual state employee, the plaintiff must allege "that

16

an act or omission of the employee that causes a loss is (1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." Ind. Code § 34-13-3-5(c)(1)).

Ms. Taylor failed to allege that the IDOC Defendants acted criminally, clearly outside the scope of their employment, maliciously, willfully and wantonly, or in a manner calculated to benefit them personally. For these reasons, no reasonable jury could conclude that the IDOC Defendants acted negligently, and they are entitled to summary judgment on this claim.

### 2. Medical Defendants

The Medical Defendants argue that they are entitled to summary judgment as to the medical negligence claims because Ms. Taylor relied upon conclusory statements and inadmissible expert testimony. Dkt. 183 at 16. In support of her medical negligence claim, Ms. Taylor filed an expert report by Dr. Sanya Virani. Dkt. 159-1. The report indicates that in providing her opinion, she only reviewed documents provided to her by Ms. Taylor's attorney. *Id.* at 1. However, those sources of data only include one page of Ms. Taylor's medical records: the discharge summary from Ascension St. Vincent hospital in November 2022, authored by non-party Dr. Douglas Kaderabek. *Id.* at 1; *see also* dkt. 182-1. Dr. Virani did not review any of Ms. Taylor's IDOC medical records created by Centurion employees, including the Medical Defendants. Dkt. 159-1 at 1. Instead, she reviewed IDOC policies, Ms. Taylor's grievances, and Ms. Taylor's deposition testimony. *Id.*

The Medical Defendants are correct that Dr. Virani's expert report is not admissible. Federal Rule of Evidence 702 allows testimony by expert witnesses if (a) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable

principles and methods, and (d) the expert's opinion reflects a reliable application of those principles and methods to the facts of the case. Dr. Virani's report fails to meet each of these elements.

"In a medical negligence claim, the plaintiff must prove by expert testimony not only that the defendant was negligent, but also that the defendant's negligence *proximately caused* the plaintiff's injury." *Clarian Health Partners v. Wagler,* 925 N.E.2d 388, 392 (Ind. Ct. App. 2010) (citation omitted) (emphasis added). For Ms. Taylor's claim, she must prove by expert testimony that the Medical Defendants were negligent in providing her medical care while she was in the HRU, and that their negligence proximately caused an injury. Because Dr. Virani failed to review a single medical record of Ms. Taylor's from her time in the HRU, her proposed testimony could not competently lead to the conclusion that the Medical Defendants' care proximately caused any injury.

Accordingly, the Medical Defendants are entitled to summary judgment on this claim.

### VI. Conclusion & Further Proceedings

In sum, Ms. Taylor's motion, dkt. [159], is **denied**, and the defendants' motions, dkts. [163] and [181], are **granted**. No partial final judgment shall issue at this time.

Further proceedings to resolve the remaining claim against Dr. Jones will be addressed via separate order.

**IT IS SO ORDERED.**

Date: 3/25/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

GREG TAYLOR
883235
INDIANA STATE PRISON
INDIANA STATE PRISON
Electronic Service Participant – Court Only

WILLIAM JONES
675 Justice Way
Electronic Service Participant – Court Only

All Electronically Registered Counsel